# EXHIBIT 3

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 11-cv-00859-WJM-KLM

AMERICAN TRADITION INSTITUTE,
AMERICAN TRADITION PARTNERSHIP, and
ROD LUECK,

      Plaintiffs,

v.

THE STATE OF COLORADO;
JOHN HICKENLOOPER, individually, and in his official capacity as Governor of Colorado;
BARBARA J. KELLEY, individually, and in her official capacity as Executive Director of the Colorado Department of Regulatory Agencies;
JOSHUA EPEL, individually, and in his official capacity as a Chairman of the Colorado Public Utilities Commission;
JAMES TARPEY, individually, and in his official capacity as a Commissioner of the Colorado Public Utilities Commission;
MATT BAKER, individually, and in his official capacity as a Commissioner of the Colorado Public Utilities Commission; and
DOUG DEAN, individually, and in his official capacity as Director of the Colorado Public Utilities Commission,

      Defendants,

ENVIRONMENT COLORADO,
COLORADO ENVIRONMENTAL COALITION,
SIERRA CLUB, and
THE WILDERNESS SOCIETY,

      Proposed Intervenors.

---

**DECLARATION OF CHARLES MONTGOMERY
IN SUPPORT OF COLORADO ENVIRONMENTAL COALITION'S
MOTION TO INTERVENE**

---

## **DECLARATION OF CHARLES MONTGOMERY**

I, Charles Montgomery, declare as follows:

1. The facts and opinions set forth in this declaration are based on my personal knowledge, experience, consultation with Colorado Environmental Coalition (CEC) staff, and a review of CEC records. If called as a witness in these proceedings, I could and would testify competently to these facts and opinions.

2. I am the Energy Program Organizer at CEC. Founded in 1965, CEC is committed to conserving Colorado's clean air, water, and open spaces, and to expanding clean energy, through grassroots organizing, policy advocacy, and media work. We have approximately 3,000 individual members and 100 member organizations that represent roughly 150,000 members statewide. CEC has offices in Denver, Grand Junction, and Craig.

3. CEC has invested considerable time and resources in the development and strengthening of Colorado's renewable energy standard (RES). Our commitment to the state's RES is driven by our conviction that the interests of our members are served by steadily enlarging the share of renewable energy used in the generation of electricity. We are convinced that such interests would be harmed if the RES is invalidated by the court.

4. CEC has been active for the last decade in supporting renewable energy in partnership with many of our organizational members. In our pioneering renewables campaign, which culminated in 2004 with the adoption of Amendment 37, the nation's first citizen-initiated RES, CEC educated voters, key stakeholders, and legislators on the value of renewable energy. From mid-2006 through early 2007, CEC mounted a media and outreach campaign and lobbied decision-makers, including the state's new governor, to raise the standard. That effort led to a doubling of the RES for investor-owned utilities during the 2007 legislative session to 20% by the year 2020. Throughout 2009, CEC mobilized support for the successful legislative campaign behind House Bill (HB) 1001, a bill passed in 2010 that raised Colorado's RES for investor-owned utilities to its current pace-setting level of 30% by 2020.

5. Along with our efforts to raise the standard, CEC has fended off efforts to undermine or roll it back. For example, during the 2011 legislative session, CEC helped mobilize the defense against Senate Bill (SB) 71, which would have repealed the 30% standard and restored the minimal level approved by voters in 2004 under Amendment 37.

6. As it has supported the ongoing campaign to enlarge the state's RES, CEC has also promoted the following complementary clean energy measures:

• Net metering. As part of the organizing campaign behind the 2004 adoption of Amendment 37, CEC successfully supported a new law to enable consumers to receive credit for power they produce but don't consume. Colorado's net metering program is now rated as one of the five best in the nation.

• Risk assessment of carbon regulation in utility costs. CEC worked hard in winning the passage of HB 08-1164, which allows the Colorado Public Utilities Commission in its review of utilities' resource plans to consider the likelihood of future regulation of greenhouse gas emissions and the resulting risk of higher costs associated with such emissions. During the 2011 legislative session, CEC organized its members and lobbied legislators to defeat HB 1240, SB 58, and SB 71, three bills that would have prevented the consideration of such cost risks.

• Coal plant retirements. In 2010 CEC invested considerable staff time to support passage of HB 1365, a bill that made Colorado the first state in the country to set statutory requirements for retiring or modifying coal-fired power plants. Following the bill's passage, CEC mobilized citizens and stakeholders to ensure favorable regulatory outcomes at the Colorado Public Utilities Commission and Department of Public Health and Environment.

7. An invalidation of the Colorado RES would inflict harm on CEC and its members. It would eliminate a key tool in addressing global climate change, an issue of grave concern to CEC and its members. CEC's climate action strategy has two overlapping but distinguishable parts: a) achieving reductions of greenhouse gas emissions, so that Colorado does its part in a national and global regime of emissions reductions; and b) promoting the widespread use of renewable energy and energy efficiency, so that Colorado creates a compelling model of how clean energy can prosper in a politically moderate state with a long history of fossil fuel extraction. The state's RES serves these dual goals. By enlarging the share of renewable resources in power generation, it diminishes our reliance on coal and other carbon-intensive fuels. And by enlarging a market for renewable resources, it creates a hospitable environment for clean energy development.

8. Invalidation would also expose CEC members to the economic risks associated with higher electricity costs. By requiring investor-owned utilities to produce 30% of their power from renewable sources by 2020, the RES offers a much-needed hedge against the higher energy costs associated with future carbon-pricing policies. Increasing our reliance on renewable resources, including and wind and solar energy, protects energy consumers from the liability of a power generation portfolio excessively burdened by risky carbon-intensive fuels.

9. Apart from the impacts of global warming pollution, CEC members are increasingly concerned about local and regional air quality. They recognize that dirty air has wide-ranging health consequences, with potentially serious pulmonary, cardiovascular, and neurological impacts. Much of the state's air pollution, consisting of sulfur dioxide, nitrogen oxides, and mercury, is emitted by coal-fired power plants, which produce roughly 60% of the power generated in the state. By gradually reducing our reliance on coal, the RES helps to clean up our air. Should the RES be invalidated by the court, Colorado citizens and CEC members would lose one of the key tools now available for keeping air pollution in check.

10. CEC members care deeply about the health of Colorado's water and open landscapes. They hike, bicycle, fish, hunt, cross-country ski, maintain and clean trails, birdwatch, raft, kayak, swim and work to preserve Colorado's wild places—at National Parks, National Monuments, wilderness areas, and elsewhere. The RES provides an indirect protective benefit to undeveloped natural environments. By reducing the share of electricity generated by fossil fuels, including coal and natural gas, the RES helps to limit the destructive effects of fossil fuel production on the Colorado landscape. This protective benefit will grow over time. Although renewable sources will replace coal faster than natural gas in the near term, an expanded RES in future years will eventually limit our reliance on all fossil fuels.

11. CEC members have benefitted financially from the opportunity to participate in the RES's solar rebate program and would be harmed in the event the RES is invalidated and the rebate program is curtailed. Likewise, CEC members now considering participating in the program would be deprived of that future material opportunity should the RES be invalidated.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Date: June 9, 2011         /s/ Charles Montgomery

Charles Montgomery
Energy Program Organizer
Colorado Environmental Coalition