# EXHIBIT 12

Decision No. C11-0509

**BEFORE THE PUBLIC UTILITIES COMMISSION OF THE STATE OF COLORADO**

DOCKET NO. 10A-377E

IN THE MATTER OF THE APPLICATION OF PUBLIC SERVICE COMPANY OF COLORADO FOR APPROVAL OF AN AMENDMENT TO ITS 2007 COLORADO RESOURCE PLAN.

DOCKET NO. 10A-905E

IN THE MATTER OF THE APPLICATION OF PUBLIC SERVICE COMPANY OF COLORADO FOR APPROVAL OF THE 2011 WIND REQUEST FOR PROPOSALS.

**INITIAL COMMISSION DECISION GRANTING AMENDED APPLICATION TO AMEND 2007 ELECTRIC RESOURCE PLAN; APPROVING REQUEST TO DEFER ACQUISITION OF SOLAR RESOURCES; APPROVING ADVANCEMENT OF FINAL 2011 WIND BIDDERS TO FINAL NEGOTIATIONS; APPROVING THE MODEL PURCHASE POWER AGREEMENT; AND ASSIGNING EXTRAORDINARY CONFIDENTIAL TREATMENT TO PUBLIC SERVICE'S COMPLIANCE FILING**

Mailed Date:  May 11, 2011
Adopted Date:  May 9, 2011

**TABLE OF CONTENTS**

I. BY THE COMMISSION ...................................................................................................... 2
   A. Procedural History ........................................................................................................ 2
   B. Scope of Consolidated Proceedings ............................................................................. 5
II. DISCUSSION ....................................................................................................................... 8
   A. Public Service's Application and Amended Application ............................................. 8
   B. Solar Resources .......................................................................................................... 11
      1. Findings ................................................................................................................ 18
   C. Wind Resource ........................................................................................................... 21

Colorado PUC E-Filings System

**Before the Public Utilities Commission of the State of Colorado**

Decision No. C11-0509                                         DOCKET NOS. 10A-377E & 10A-905E

    1.  Findings ..................................................................................................26
III.  ORDER ...........................................................................................................................32
    A.  The Commission Orders That: ............................................................................32
    B.  ADOPTED IN COMMISSIONERS' DELIBERATIONS MEETING May 9, 2011 ......33

### I.  BY THE COMMISSION

#### A.  Procedural History

1. Public Service Company of Colorado (Public Service or Company) filed an Application for Approval of an Amendment to its 2007 Electric Resource Plan (Application) on June 4, 2010 in Docket No. 10A-377E. The Application sought approval of one of three options put forth by Public Service as discussed in more detail below.

2. The Commission issued notice of the initial Application to all interested parties on June 8, 2010.

3. Parties that filed interventions in the initial Application included Commission Staff (Staff); the Colorado Office of Consumer Counsel (OCC); Interwest Energy Alliance (IEA); the Colorado Independent Energy Association (CIEA); Blanca Ranch Holdings, LLC and Trinchera Ranch Holdings, LLC (collectively, Trinchera Ranch); Climax Molybdenum Company (Climax) and CF&I Steel, LP, doing business as Evraz Rocky Mountain Steel (CF&I); Western Resource Advocates (WRA); Ms. Leslie Glustrom; Fotowatio Renewable Ventures, Inc.; Noble Energy, Inc., Chesapeake Energy, Inc., and Encana Corporation (collectively, Gas Intervenors); and the Colorado Governor's Energy Office (GEO).[1]

---

[1] A petition for late-filed intervention was granted for E.ON Climate & Renewables North America, LLC (E.ON); however, E.ON later withdrew its intervention on January 14, 2011.

Colorado PUC E-Filings System

SLV-Calumet-Comanche transmission line and the litigation in its original Application, the Company requested that the 2007 ERP be amended to include only Option 3. Option 3 contemplated a delay in the acquisition of additional solar resources above the 60 MW of solar PV currently under negotiation until the Phase II acquisition process as part of Public Service's 2011 ERP. Public Service requested that the Commission authorize it to reject all remaining bids from the 2009 All Source RFP and to proceed to obtain the remaining wind and solar resources through future solicitations. Public Service represented that it could acquire additional wind and solar resources at lower cost than the prices that were bid by the remaining 2009 All Source RFP.

30. We are asked to allow Public Service to reject all remaining bids from the 2009 All Source RFP and to allow it to proceed to obtain the remaining wind and solar resources through future solicitations. As a result, two key issues require resolution in this consolidated proceeding. With regard to the solar acquisition, the issue is whether we should approve delaying consideration of further acquisition of solar resources to Public Service's 2011 ERP proceeding. Regarding the wind resource acquisition, the issue is whether we should approve Public Service's 2011 targeted wind solicitation and approve the advancement of the leading three wind bidders responding to the Company's 2011 Wind RFP to final negotiations.[7]

**B. Solar Resources**

31. Public Service states that the price of the concentrating solar power (CSP) with storage bid that could be accommodated with the current transmission capacity is expected to approach $2.5 billion (in nominal terms) over the 30-year life of the proposed contract. Due to the continued decline in gas prices for the last 6 to 12 months, the incremental cost of

---

[7] Public Service additionally requests that we approve its Model Wind Purchase Power Agreement.

Before the Public Utilities Commission of the State of Colorado
Decision No. C11-0509                                                                DOCKET NOS. 10A-377E & 10A-905E

this contract, compared with alternative generation, would have a first year impact of nearly $30 million according to Public Service.

32. It was under substantially different market conditions than exist today that the Company indicated during the 2007 ERP proceedings that the price of a concentrating solar power with storage facility was reasonable. However, now Public Service represents it is not reasonable for its customers to pay such a large incremental cost. Public Service notes that the price of the CSP facility rose by 7 percent when it asked the bidder to reduce the size of the facility to fit within the capacity of current transmission capacity.

33. As a result of these circumstances, Public Service believes it should be allowed to wait until the 2011 ERP to revisit the acquisition of large solar thermal with storage facilities, using new bids that reflect current market pricing and the economies of scale that might be realized once the SLV-Calumet-Comanche line is in service.

34. Generally, the majority of intervenors agree with Public Service's position concerning the acquisition of additional solar resources. For example, the OCC determined that the unique circumstances which Public Service describes suggest that Public Service's customers would be better off if the Resource Plan were amended. The OCC comments that as the regulator of public utilities, the Commission's regulatory powers and duties are primarily to protect consumers who have little or no choice in the selection of their provider because the utility enjoys monopoly status. Although the Commission spends considerable resources and time in selecting the best possible resource plan every four years, the OCC points out that circumstances sometimes change that require that those plans be amended.

35. The OCC recognizes that the Company seeks only to defer the acquisition of certain solar resources to its next resource plan, to be filed at the end of this year, as it would not be

cost effective to purchase energy that may not be deliverable. The OCC is concerned that if Public Service were to enter into a PPA with the winning bidders, customers could potentially have to pay for electricity twice - once for solar energy that cannot be delivered to load, and a second time for replacement energy that can be delivered to load.

36. Trinchera Ranch, the Gas Intervenors, and Climax and CF&I by and large agree with the OCC. Trinchera Ranch takes the position that neither the original nor the revised solar thermal with storage bids are reasonable or cost-effective. It agrees with Public Service that the proposed 125 MW solar thermal project, at nearly $2.5 billion over the 30-year life of the proposed contract, would have a first year incremental impact over the cost of fossil-fueled alternative generation of nearly $30 million. Trinchera Ranch agrees that this would be an unreasonable cost borne solely by ratepayers.

37. Trinchera Ranch observes that the revised 125 MW solar resource would produce, at best, approximately 1.8 percent of Public Service's on-peak generation capacity, and potentially no generation during off-peak hours at a cost of billions of dollars to the Company's ratepayers. As a result, Trinchera Ranch argues that the acquisition of the solar thermal with storage resource should be deferred indefinitely, so that ratepayers are not forced to pay for an overpriced, unnecessary, and risky multi-billion dollar resource.

38. Trinchera Ranch also points to changed economic assumptions which have brought into question whether solar thermal with storage resources will ever become cost-effective, which cannot be effectively resolved until the Company's 2011 ERP. Trinchera Ranch notes such factors as steep declines in natural gas prices from the $12.50/MMBtu New York Mercantile Exchange price discussed during the previous ERP hearings in 2008 to the current price of $6/MMBtu. In addition, it appears that solar thermal with storage costs may be

Colorado PUC E-Filings System

declining. Another important factor in Trinchera Ranch's position to defer the solar thermal with storage facility indefinitely is that the originally assumed carbon proxy cost of $20/ton beginning in 2010 never came to pass. It is not known whether or when such a carbon proxy cost will be imposed. Trinchera Ranch argues that, without that assumed cost, solar thermal prices will have to drop dramatically before these resources can be deemed cost-effective or reasonable for purposes of the Renewable Energy Standard Adjustment (RESA).

39. The Gas Intervenors agree that Public Service has met the implicit requirements of demonstrable change in circumstances for both the Phase I and Phase II orders in the 2007 ERP required by Commission Rule 4 *Code of Colorado Regulations* (CCR) 723-3-3618, Rules Regulating Electric Utilities, to delay acquisition of solar resources under bid SC04 until the 2011 ERP, because of transmission constraints in the San Luis Valley and dramatic declines in the cost of gas-fired generational resources from 2009.

40. Staff, WRA, and Ms. Glustrom agree with Public Service, in part, regarding deferral of the acquisition of additional solar resources. Staff agrees that the record evidence supports Public Service's suggestion that falling gas prices, coupled with falling prices for solar resources calls into question the continued reasonableness of the solar bids received in the 2009 RFP.

41. Staff's position is that changed circumstances must be significant before Public Service would be justified in seeking an amendment to its 2007 ERP. In this case, Staff argues that the infeasibility of carrying through with the approved solar resource acquisition plan justifies and necessitates Public Service coming to the Commission to amend the approved 2007 ERP. After considering all options, Staff sees no benefit in moving forward at this time

Colorado PUC E-Filings System

with the specific 125 MW concentrated solar with storage bid that is a higher cost than the 250 MW option that became infeasible.

42. Staff cites several specific reasons for its support of Public Service's request to delay any further solar acquisitions until the 2011 ERP. In addition to the infeasibility of contracting for the resources contemplated by the approved 2007 ERP, Staff finds sufficient evidence to support Public Service's suggestion that the market for solar resources has changed substantially, which may lead to lower prices than those obtained from the 2009 RFP. Additionally, by waiting until the 2011 ERP docket, Staff believes the Commission can take a fresh look at a number of factors that influence the decision of which resources to acquire--including the current market for solar resources, Public Service's solid position with respect to the Renewable Energy Standard (RES) compliance, the significant advanced spending of future RESA funds, and the overall rate impact of investments in Section 123 resources.

43. However, despite Staff's position to allow the Company to defer acquisition of a 125 MW concentrated solar with storage bid, Staff argues that it would be appropriate to consider solar projects of this size or smaller in the 2011 ERP. Staff opposes any suggestion that the Commission should prejudge in this proceeding the amount or size of these types of solar resources that should be acquired in the next ERP.

44. WRA, on the other hand, recommends that Decision No. C09-1257 (the Phase II Order), requiring acquisition of 250 MW of solar thermal with storage resources and 30 to 45 MW of solar PV resources not be overruled in this consolidated proceeding. WRA takes the position that the decision as to the proper balance of resources for Public Service's supply portfolio has already been thoroughly vetted in the 2007 ERP. According to WRA, there is insufficient evidence here to disturb the Phase II findings.

45. While Public Service argues that the delays in the SLV-Calumet-Comanche transmission line have prevented it from meeting the solar requirements, WRA contends that this alone does not justify modification of the Phase II Order to acquire a 250 MW solar with storage facility. Although the price of natural gas has decreased considerably since the 2007 ERP proceedings, WRA points out that the costs of a 250 MW concentrating solar with storage facility may have also decreased.

46. WRA finds many benefits to a 250 MW facility in comparison to a 125 MW or smaller plant. Such a larger facility provides more clean and safe energy, and greater storage capacity, and would displace fossil fuel. Additionally, investment in a 250 MW Section 123 resource is in compliance with Colorado law and energy policy under § 40-2-123, C.R.S.

47. WRA contends that the project should be rebid to take advantage of lower prices, but it does not advocate for a reduction in the size of the project. WRA observes that the record evidence in this matter shows there are economies of scale associated with a 250 MW size project. While 125 MW facilities feature economies of scale relative to smaller projects, the bids received by Public Service show that a 250 MW project entails economies of scale benefits over a 125 MW project. WRA goes on to argue that the record evidence further reveals that bids received in 2009 indicate that combining two 125 MW concentrating solar thermal plants into one project with storage, built in stages by one developer, is more cost effective than constructing a smaller facility. The bidder for the SCO4 project estimated higher relative costs for a 125 MW concentrating solar power plant with storage than for a 250 MW project. Moreover, the smaller facility would offer less storage capacity and Public Service would purchase relatively less energy from the smaller facility.

Before the Public Utilities Commission of the State of Colorado
Decision No. C11-0509                                             DOCKET NOS. 10A-377E & 10A-905E

48.     WRA also advocates for the acquisition of 30-45 MW of Solar PV resources without delay. It contends that there is currently sufficient transmission capacity from the San Luis Valley to accommodate additional 30 to 45 MW of PV resources. WRA supports this position because acquiring these resources through a new PV bidding round in 2011 would be consistent with the 2007 ERP, could reduce costs to ratepayers, and should help alleviate Public Service's anticipated short position in 2015.

49.     On the other hand, Ms. Glustrom argues that Public Service should not proceed with the last 30 MW of PV bids at this time. She notes testimony from Public Service witness Mr. Haeger that, if the Company proceeds with the last 30 MW of PV resources in the San Luis Valley, then it will not be possible to move ahead with the 125 MW concentrating solar power with thermal storage project until the SLV¬Calumet¬Comanche transmission line is built. It is Ms. Glustrom's position that it would be unwise to foreclose a Section 123 concentrating solar power project with thermal storage in the San Luis Valley because a PV project reduced the capacity in the existing transmission line to below 100 MW.

50.     Ms. Glustrom does, however, support moving forward with negotiations for a PPA for 125 MW of concentrating solar power. She argues that concentrating solar power projects with thermal storage provide a dispatchable form of renewable energy which can be called on to produce electricity even when the sun does not shine. Ms. Glustrom finds support for her position from the Phase II Decision, which she characterizes as expressing strong support for moving forward with concentrating solar power with thermal storage because it "may have great promise for the future, as it overcomes the intermittent barrier for renewable resources." (Decision No. C09-1257, at ¶ 50, pp. 20-21). Given the Commission's desire to move ahead

with the technology, Ms. Glustrom reasons that it would be inappropriate to undermine that policy directive here.

51.     Ms. Glustrom further argues that record evidence shows that Public Service can perform upgrades to the San Luis Valley to Poncha transmission line to allow 185 MW of total additional generation capacity in the San Luis Valley. These upgrades would allow enough transmission capacity for the 125 MW concentrating solar power project with storage. She further notes that given the permitting and construction delays, it is unlikely that a concentrating solar power with thermal storage project can be completed before 2015, which would further push back the acquisition of such a project, which is unnecessary and inappropriate, given the legislative mandates contained in § 40-2-123, C.R.S.

### 1.     Findings

52.     The purpose of the Commission's ERP Rules is to "establish a process to determine the need for additional electric resources by electric utilities subject to the Commission's jurisdiction and to develop cost-effective resource portfolios to meet such need reliably." (4 CCR 723-3-3601). The Commission is to also give "the fullest possible consideration to the cost-effective implementation of new clean energy and energy-efficient technologies." *Id.*

53.     While the ERP process provides a mechanism to fully investigate, scrutinize and examine Public Service's resource plan, the Commission recognized that given the six to ten-year resource acquisition period in which the utility will acquire specific resources, circumstances could change significantly during that acquisition period which would require a reassessment of the reasonableness of acquiring certain resources. Rule 3618 provides the means

Colorado PUC E-Filings System

**Before the Public Utilities Commission of the State of Colorado**

Decision No. C11-0509                                                                  DOCKET NOS. 10A-377E & 10A-905E

for a utility to file an application to amend the contents of an ERP approved pursuant to Rule 3616 when circumstances so warrant.

54. Due to the delays associated with obtaining a certificate of public convenience and necessity for the SLV-Calumet-Comanche transmission line and these protracted proceedings, several significant changes occurred, precipitating Public Service's Amended Application. The price of natural gas has declined substantially since the 2007 ERP, as has the prices offered for wind and solar facilities, which are now considerably lower than the prices offered to Public Service in its 2009 All Source Solicitation.

55. Additionally, the record evidence illustrates that with respect to the concentrating solar power with storage bid that could be accommodated with the existing transmission capacity, the price of the smaller 125 MW solar thermal project, in nominal terms, was expected to approach $2.5 billion over the 30-year life of the proposed contract. As gas prices have continued to decline over the last 6 to 12 months, Public Service asserts that the incremental cost of this contract, compared with alternative generation, would now have a first year impact of nearly $30 million.

56. It is changed circumstances such as these for which Rule 3618 was promulgated. The record evidence demonstrates that the market conditions that existed during the 2007 ERP proceeding are substantially different than those that exist today. Therefore, we agree that it is reasonable and in the public interest to allow Public Service to amend the 2007 ERP.

57. We are convinced by the record evidence and the representations of the parties that changed circumstances regarding the solar acquisitions require that acquisition of this resource be deferred to the 2011 ERP. While a 125 MW concentrating solar with storage option is available and feasible, Public Service's unrebutted testimony is that it comes at a higher price

Colorado PUC E-Filings System

**Before the Public Utilities Commission of the State of Colorado**

Decision No. C11-0509                        DOCKET NOS. 10A-377E & 10A-905E

than the 250 MW option.  In addition, the Company's testimony is that energy markets have changed substantially since early 2009, when Public Service issued its 2009 RFP, particularly with respect to increased natural gas supplies and falling natural gas prices.

58. Public Service's witness Mr. Haeger testified that market information tends to show that the cost of solar resources has come down over the last two years.  These changed market conditions have caused the Company to question the continued reasonableness of the solar bids it obtained in the 2009 RFP in general and the concentrating solar with storage bid in particular.  As a result, Public Service, Staff, and the OCC posit that it is best to wait until the 2011 ERP to acquire additional concentrating solar with storage resources.  We are in agreement with this position and find that it is most beneficial to the public interest to defer a decision on the acquisition of a concentrating solar with storage resource to the 2011 ERP.

59. While Public Service maintains it can still acquire the additional 30 MW of solar PV contemplated by the approved 2007 ERP, it also argues that the cost of the transmission upgrades necessary to accommodate these resources, coupled with changed market conditions, justify waiting until the 2011 ERP to acquire any additional solar PV resources as well.

60. WRA supports continued acquisition of 30 to 45 MW of solar PV, while Ms. Glustrom argues that Public Service should continue to negotiate a PPA for 125 MW of concentrating solar power.  We decline to adopt either of those positions.  On the other hand, Trinchera Ranch argues that the acquisition of solar resources should be delayed indefinitely.  We decline to adopt that position as well.  Rather, as stated above, we agree with Public Service, Staff, the OCC, and the other parties that argue it is most effective to delay acquisition of concentrating solar and PV solar resources until the 2011 ERP.  We find that the changed market

Colorado PUC E-Filings System

circumstances, which arose during the delays as described previously, coupled with the cost of transmission upgrades necessary to accommodate additional PV resources, provide adequate justification to re-address these acquisitions in Public Service's 2011 ERP. Therefore, Public Service's Amended Application to amend the 2007 ERP to defer the acquisition of the remaining solar resources to the 2011 ERP as discussed above will be granted.

### C. Wind Resource

61. Public Service's rationale to amend the 2007 ERP by rejecting the remaining wind bid (W005 201 MW) that resulted from the 2009 All Source Solicitation was based on similar reasons as its request to defer the solar acquisitions to the 2011 ERP. Due to a series of events, including the delays in the licensing of the SLV-Calumet-Comanche transmission line; the willingness of the wind bidder to build the interconnection to Comanche and lower its bid price, coupled with the information Public Service received indicating that wind prices in the marketplace had declined, the Company became concerned that the offered wind bid may not have been as good of a deal as first thought.

62. As a result of these concerns, Public Service no longer believed it was appropriate to move forward with this one last remaining wind bid. Instead, it supplemented its request to amend the 2007 ERP to include a request to seek new wind bids to fill the remaining 201 MW of wind resources in the resource plan. At the same time, it also filed with the Commission an application to approve a targeted solicitation to acquire the replacement wind. Because of the short timeframe available to complete the RFP and have the selected project completed by the end of 2012 - the current expiration of the federal production tax credit for wind facilities – Public Service proceeded with processing the 2011 Wind RFP. The Company further represented

**Before the Public Utilities Commission of the State of Colorado**

Decision No. C11-0509                                                              DOCKET NOS. 10A-377E & 10A-905E

**B.   ADOPTED IN COMMISSIONERS' DELIBERATIONS MEETING**
       May 9, 2011.

(S E A L)

ATTEST: A TRUE COPY

*Doug Dean*

Doug Dean,
Director

THE PUBLIC UTILITIES COMMISSION
OF THE STATE OF COLORADO

JAMES K. TARPEY
_____

MATT BAKER
_____
                       Commissioners

CHAIRMAN RONALD J. BINZ
RESIGNED EFFECTIVE APRIL 8, 2011.

Colorado PUC E-Filings System

33