**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge William J. Martínez**

Civil Action No. 11-cv-00859-WJM-BNB

ENERGY AND ENVIRONMENT LEGAL INSTITUTE, and
ROD LUECK,

      Plaintiffs,

v.

JOSHUA EPEL,
JAMES TARPEY, and
PAMELA PATTON, in their official capacities as Commissioners of the Colorado Public
Utilities Commission,

      Defendants,

and

ENVIRONMENT COLORADO,
CONSERVATION COLORADO EDUCATION FUND,
SIERRA CLUB,
THE WILDERNESS SOCIETY,
SOLAR ENERGY INDUSTRIES ASSOCIATION, and
INTERWEST ENERGY ALLIANCE,

      Intervenor-Defendants,

---

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' EARLY
MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' LACK OF STANDING**

---

This action challenges the constitutionality of Colorado's Renewable Energy

Standard statute, Colo. Rev. Stat. § 40-2-124.  Specifically, Plaintiffs seek a declaration

that particular provisions of this statute and their implementing regulations violate the

Commerce Clause of the United States Constitution and seek injunctive relief

preventing enforcement of those provisions.  (Am. Compl. (ECF No. 163) pp. 40-45.)

Before the Court is Defendants' Early Motion for Summary Judgment on

Plaintiffs' Lack of Standing (ECF No. 188) ("Motion").  For the reasons set forth below,

the Motion is granted in part and denied in part.

## I.  LEGAL STANDARD

Summary judgment is appropriate only if there is no genuine issue of material

fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P.

56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Henderson v. Inter-Chem*

*Coal Co., Inc.*, 41 F.3d 567, 569 (10th Cir. 1994).  Whether there is a genuine dispute

as to a material fact depends upon whether the evidence presents a sufficient

disagreement to require submission to a jury or conversely, is so one-sided that one

party must prevail as a matter of law.  *Anderson v. Liberty Lobby*, 477 U.S. 242, 248-49

(1986); *Stone v. Autoliv ASP, Inc.*, 210 F.3d 1132 (10th Cir. 2000); *Carey v. U.S. Postal*

*Serv.*, 812 F.2d 621, 623 (10th Cir. 1987).

A fact is "material" if it pertains to an element of a claim or defense; a factual

dispute is "genuine" if the evidence is so contradictory that if the matter went to trial, a

reasonable party could return a verdict for either party.  *Anderson*, 477 U.S. at 248.

The Court must resolve factual ambiguities against the moving party, thus favoring the

right to a trial.  *Houston v. Nat'l Gen. Ins. Co.*, 817 F.2d 83, 85 (10th Cir. 1987).

## II.  FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Plaintiff Energy and Environment Legal Institute[1] ("EELI") is a non-profit

---

[1]  The Energy and Environment Legal Institute was formerly known as the American Tradition Institute.  (ECF No. 200.)  Plaintiffs represent that this was only a name change and does not impact the purpose or activities of the institute.

organization dedicated to the advancement of rational, free-market solutions to land, energy, and environmental challenges in the United States. (Am. Compl. ¶ 3.) EELI also promotes coal energy, and believes that the impact human activities have had on the rise in global temperatures is an open question. (ECF No. 188 ¶ 3; ECF No. 194-1.) Plaintiff Rod Lueck is a member of EELI who resides in Colorado. (*Id*. ¶ 4.) Mr. Lueck is the owner and president of Techmate, a financial services company based in Colorado. (*Id*.) Defendants Joshua Epel, James Tarpey, and Pamela Patton are members of the Colorado Public Utilities Commission. (*Id*. ¶¶ 6-8.) Intervenor-Defendant[2] Solar Energy Industries Association is a trade association with member companies in Colorado and throughout the United States whose members are benefitting from the challenged statutes. (ECF No. 75.) For purposes of this Order, the Court's reference to "Defendants" includes the Solar Energy Industries Association.

In 2004, Colorado voters passed Amendment 37, which was intended to promote the development and utilization of renewable energy resources. (*Id*. ¶ 60.) Amendment 37 is now codified as the Renewable Energy Standard statute (the "RES") at Colo. Rev. Stat. § 40-2-124. Plaintiffs' Amended Complaint brings six claims—three for declaratory relief and three for injunctive relief—alleging that three discrete provisions of the RES violate the Commerce Clause[3] of the United States Constitution. (*Id*. ¶¶ 137-51.)

----

[2] The remaining Intervenor-Defendants do not join in the instant Motion, instead filing a Motion for Partial Summary Judgment on Claims 1 & 2. (ECF No. 186.)

[3] The Commerce Clause empowers the U.S. Congress "[t]o regulate Commerce . . . among the several States . . . ." U.S. Const. art. I, § 8, cl. 3. The U.S. Supreme Court has interpreted the Commerce Clause as authorizing Congress to regulate "the channels of interstate commerce," "persons or things in interstate commerce," and "those activities that substantially affect interstate commerce." *United States v. Morrison*, 529 U.S. 598, 609 (2000). Although the text of the Commerce Clause does not expressly limit the power of states, the

First, Plaintiffs challenge Colo. Rev. Stat. §§ 40-2-124(1)(c)(I),(V),(V.5) and 40-2-124(3),(4) and their implementing regulations codified at 4 Colo. Code Regs. §§ 723-3 *et seq.* (the "Renewables Quota").  The Renewables Quota requires each retail utility to generate, or cause to be generated, renewable energy resources in specified minimum amounts.  (*Id.* ¶¶ 137-141.)  The Renewables Quota is structured so that the percentage of electricity that must be generated from renewable sources increases over time.  The Renewables Quota started in 2007, and requires that each qualifying utility obtain at least 3 percent of its electricity from recycled or renewable sources.  Colo. Rev. Stat. § 40-2-124(1)(c)(I)(A).  The Renewables Quota increases every few years such that, by the year 2020, each qualifying retail utility[4] is required to obtain at least 30% percent of its energy from renewable sources.  *See* Colo. Rev. Stat. § 40-2-124(1)(c)(I)(B)-(E).

Plaintiffs next challenge Colo. Rev. Stat. §§ 40-2-124(1)(c)(I)(C)–(E) and 40-2-124(1)(c)(V)(D) (the "Distributed Generation Provision").  The Distributed Generation Provision governs how much renewable energy must come from "distributed generation" sources.  "Distributed generation" means renewable energy that is produced on the site of a customer's facility, or in a facility with a rating of less than thirty megawatts.  *See* Colo. Rev. Stat. § 40-2-124(1)(a)(VIII).  Like the Renewables

---

Supreme Court has read into the Commerce Clause a "negative implication" – the dormant Commerce Clause – that prohibits states from passing laws that improperly burden or discriminate against interstate commerce.  *See, e.g.*, *Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 337-39 (2008).

[4]  A lower percentage applies to cooperative electric associations, with additional differentiation between those cooperatives that serve less than 100,000 utility meters and those that serve more than 100,000 utility meters.  *See* Colo. Rev. Stat. § 40-2-124(1)(c)(V), (V.5).

Quota, the Distributed Generation Provision requires that an increasingly large percentage of the renewable energy generated by the utilities come from distributed generation sources.  Colo. Rev. Stat. § 40-2-124(1)(c)(I)(C)-(E).  In 2013-14, one percent of a utility's retail sales is required to come from distributed generation sources, with this percentage increasing to three percent by the year 2020.  *Id*.

Finally, Plaintiffs challenge Colo. Rev. Stat. § 42-2-124(1)(c)(IX) (the "2:1 Provision").  The 2:1 Provision counts each kilowatt hour of renewable electricity generated by rural cooperative electrical associations and municipally owned utilities as two kilowatt hours, for purposes of the Renewables Quota.  The 2:1 Provision is intended to "stimulat[e] rural economic development".  Colo. Rev. Stat. § 42-2-124(1)(c)(IX).

Defendants previously filed a Motion to Dismiss which argued that Plaintiffs did not have standing to pursue their claims.  (ECF Nos. 28.)  The Court denied the Motion, finding that Plaintiffs had alleged sufficient facts to survive a Motion to Dismiss based on an alleged injury to unnamed electrical companies and an unnamed coal producer that are members of EELI.  (ECF No. 64.)  During discovery, Plaintiffs clarified that they were basing their standing to bring this action only on Alpha Natural Resources, Inc. and its related companies ("Alpha"), as well as Plaintiff Rod Lueck.  (ECF No. 188-2.)  Alpha is a mining company that operates two coal mines in Wyoming, and is a member of EELI.  (ECF No. 188 at 4.)  At this point, Plaintiffs are not claiming standing based on any electrical companies that are members of EELI.  (ECF No. 188-2.)

On September 30, 2013, Defendants filed the instant Early Motion for Summary Judgment on Plaintiffs' Lack of Standing.  (ECF No. 188.)  Plaintiffs filed their response on October 21, 2013 (ECF No. 194), and Defendants filed their reply on November 18,

2013 (ECF No. 198).  The Motion is now ripe for review.

## III.  ANALYSIS

Article III of the United States Constitution limits the jurisdiction of federal courts to "[c]ases" and "[c]ontrovers[ies]."  U.S. Const. art. III, § 2.  "No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies."  *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 37 (1976).

"[T]he core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  "The gist of the question of standing" is whether the plaintiffs have "alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions."  *Baker v. Carr*, 369 U.S. 186, 204 (1962).  Standing "is perhaps the most important of the[] doctrines" limiting the federal judicial power.  *Allen v. Wright*, 468 U.S. 737, 750 (1984).

There are two aspects to standing: constitutional standing and prudential standing.  The Court will discuss each in turn below.

## A.    Constitutional Standing

"[T]he irreducible constitutional minimum of standing contains three elements": the plaintiff must have suffered a "concrete and particularized" injury that is "actual or imminent" (*i.e.*, an "injury in fact"), there must be "a causal connection between the injury and the conduct complained of," and it must be "likely . . . that the injury will be

redressed by a favorable decision." *Lujan*, 504 U.S. at 560-61 (quotation marks omitted); *see also Allen*, 468 U.S. at 751 ("A plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief.").  "The party invoking federal jurisdiction bears the burden of establishing these elements." *Lujan*, 504 U.S. at 561.

As an association, Plaintiff EELI must establish standing by showing that one of its members has individual standing to challenge the disputed provisions.  *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000) (an association has standing to bring suit on behalf of its members "when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.").  EELI asserts associational standing based on two members: Alpha and Lueck.  (ECF No. 188-2.)  The Court will separately analyze whether either of these members has individual standing to bring this suit.

*Generalized or Particularized Standing*

To appropriately analyze the instant Motion, the Court must first address the level of specificity with which Plaintiffs must prove their standing.  Defendants contend that Plaintiffs must separately prove that they have standing to challenge each of the three provisions of the RES described above.  (ECF No. 198 at 6.)  Plaintiffs contend that this lawsuit challenges the RES as a whole and, therefore, they are required only to show that the RES as a whole has caused them an injury which is redressable through

this lawsuit.  (ECF No. 194 at 12.)

"[S]tanding is not dispensed in gross."  *Lewis v. Casey*, 518 U.S. 343, 357 n.6 (1996).  Rather, a party challenging multiple statutory provisions must show that it has been injured by each challenged provision.  *See DaimlerChrysler v. Cuno*, 547 U.S. 332, 353 (2006) (plaintiff's injury caused by a municipal taxing scheme did not give it standing to challenge a state tax scheme that did not injure it)*; Chamber of Commerce v. Edmondson*, 594 F.3d 742 (10th Cir. 2010) (separately analyzing plaintiff's standing to challenge each provision at issue).  The cases cited by Plaintiffs show only that, once a party has established standing to challenge a particular provision, it may assert many different theories for why that provision is invalid.  *See DaimlerChrysler*, 547 U.S. at 353 n.5.  These cases do not stand for the proposition that a party with standing to challenge one statutory provision may leverage that injury into standing to challenge an entire statutory scheme, or indeed even a separate statutory provision.

Contrary to Plaintiffs' assertion, the Court finds that Plaintiffs' Amended Complaint does not seek to invalidate the RES as a whole.  Rather, it challenges three discrete provisions in the RES: the Renewables Quota, the Distributed Generation Provision, and the 2:1 Provision.  (Am. Compl. ¶¶ 137-51.)  Because these are three separate statutory provisions, the Court concludes that Plaintiffs must show they have standing to challenge each of them.  Thus, the Court will review each challenged provision and determine whether Plaintiffs have satisfied each element of standing with regard to that provision.

1.    Renewables Quota

Plaintiffs allege that Alpha has standing to challenge the Renewables Quota based on: (1) the actual coal sales that it has lost since the Quota took effect, and (2) the lost ability to compete for that portion of the market now set aside for renewable energy.  The Court will discuss each of these theories below.

a.    *Lost Sales*

The evidence shows that, prior to 2009, Xcel Energy—a major electric company in Colorado—bought 100% of its coal for two power plants from Alpha and that, since 2009, these sales have decreased.  (Romer Decl. (ECF No. 188-1) ¶ 7.)  However, in that same declaration, Xcel further states that the reason it began purchasing coal from Alpha's competitors was due to the fact that these competitors have been offering Xcel a better price.  (*Id.* ¶ 8.)  Xcel has explicitly stated that the RES is not the reason it has reduced the amount of coal it buys from Alpha.  (*Id.*)  Plaintiff has offered no evidence to rebut this contention.  Therefore, the Court finds that Alpha's lost sales are an injury-in-fact, but that Plaintiffs have not shown that this injury was caused by the Renewables Quota or any other provision of the RES.  Moreover, were the Court to find that the Renewables Quota was unconstitutional, there is no evidence that Alpha would be able to increase its sales.

As such, with regard to the injury of actual lost sales, the Court finds that Plaintiffs have failed to satisfy the causation and redressability elements of standing.

b.    *Lost Ability to Compete*

Plaintiffs also assert that the Renewables Quota has injured Alpha by limiting its ability to compete for that portion of the energy market set aside for renewable energy.

(ECF No. 194 at 14-15.)

The Supreme Court has held that, when challenging a set-aside program, "the 'injury in fact' is the inability to compete on an equal footing in the bidding process." *See N.E. Fla. Chapter of the Assoc. Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993) (holding that contractors had shown an injury due to inability to compete for contracts set aside for minority-owned businesses); *see also Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 280-81 (1978) (Caucasian applicant for medical school had shown an injury in fact based on the inability to compete for spots reserved for minority applicants). "To establish standing, therefore, a party challenging a set-aside program . . . need only demonstrate that it is able and ready to bid on contracts and that a discriminatory policy prevents it from doing so on an equal basis."[5] *N.E. Fla.*, 508 U.S. at 666.

The Court finds that, under this standard, Plaintiffs have sufficiently alleged an injury in fact. Plaintiffs have shown that the Renewables Quota prevents Alpha—as a coal producer—from being able to compete for 30% of the energy market. Plaintiffs need not show that Alpha would actually have won any contract for this 30% of the market; the loss of the ability to compete is the injury. *Bakke*, 438 U.S. at 281 n.14 (medical school's decision not to let applicant compete for all 100 spots because of his

---

[5] Defendants contend that this line of cases applies only to claims brought under the Equal Protection Clause. However, the case law does not support this argument. *See Lac Du Flambeau Band of Lake Superior Chippewa Indians v. Norton*, 422 F.3d 490, 497-98 (7th Cir. 2005) (noting that the holdings in *N.E. Fla.* and *Baake* regarding injury for purposes of standing are "not limited to cases alleging a violation of the Equal Protection Clause."). "Whether to apply this analysis depends on the nature of the alleged injury, not the source of the asserted right." *Id.* (citing *Lujan*, 504 U.S. at 576 ("[T]here is absolutely no basis for making the Article III inquiry turn on the source of the asserted right.")).

race was injury).

The Court also finds that Alpha's inability to compete for 30% of the energy market is directly caused by the Renewables Quota.  Finally, the Court finds that this injury is redressable because, were the Court to hold that the Renewables Quota was invalid, the 30% of the market currently set aside for renewable energy would reopen to non-renewable sources, such as coal producers.

Therefore, the Court finds that Alpha has suffered an injury in fact, which is caused by the Renewables Quota and redressable in this case.  Because Alpha would have standing to challenge the Renewables Quota on its own, EELI has standing to bring this case on Alpha's behalf.  *See Friends of the Earth*, 528 U.S. at 181. Accordingly, the Court finds that Plaintiffs have constitutional standing to pursue Claims 1 and 2 of their Amended Complaint.

    2.    <u>Distributed Generation Provision & 2:1 Provision</u>

Plaintiffs do not attempt to show any specific injury caused by the Distributed Generation Provision or the 2:1 Provision, relying on their argument that they are required only to show a generalized injury arising from the RES to establish standing to bring all of their claims.  As discussed above, the Court has rejected this argument and held that Plaintiffs must show that they have standing to challenge each provision of the RES at issue in this case.  Because Plaintiffs bear the burden of showing standing, their failure to separately address their standing as to each claim is alone reason to dismiss the claims challenging the Distributed Generation Provision and the 2:1 Provision.  *See Bear Lodge Multiple Use Ass'n v. Babbit*, 175 F.3d 814, 821 (10th Cir. 1999) ("The party invoking federal jurisdiction bears the burden of coming forward with evidence of

specific facts which prove standing.").  However, in the interest of completeness, the Court will evaluate whether Plaintiffs have adduced sufficient evidence to show that they have standing to challenge these provisions.

a.    *Alpha's Standing*

The Distributed Generation Provision requires that half of the energy a utility generates to satisfy the Renewables Quota be derived from distributed generation sources.  *See* Colo. Rev. Stat. § 40-2-124(1)(c)(II)(A).  For example, if the Renewables Quota requires a utility to generate 30% of its energy using renewable sources, the Distributed Generation Provision requires that half of that 30% (or 15%) be generated by distributed generation sources.  The 2:1 Provision counts each kilowatt hour of renewable electricity generated by rural cooperative electrical associations and municipally owned utilities as two kilowatt hours, for purposes of the Renewables Quota.  Colo. Rev. Stat. § 42-2-124(1)(c)(IX).

With respect to Alpha, as discussed above, the Court has found that the Renewables Quota caused Alpha to lose the ability to compete for the portion of Colorado's energy market that is set aside for energy from renewable sources. However, the Court finds that this injury is not altered or amplified by the Distributed Generation Provision or the 2:1 Provision.  As a coal producer, Alpha cannot compete for any portion of the market set aside for renewable energy, regardless of whether the renewable energy comes from large-scale wind or solar installations or from distributed generation, and whether it is produced by rural cooperative electrical associations. Neither the Distributed Generation Provision nor the 2:1 Provision enlarge the piece of the pie that, because of the Renewables Quota, is reserved for energy generated from

renewable sources.  All these provisions do is subdivide that piece of pie in different ways.

Because Alpha's injury is the loss of the ability to compete for the portion of the market set aside for renewable energy, and neither the Distributed Generation Provision nor the 2:1 Provision have any causal effect on this injury, the Court finds that Plaintiffs have failed to show that Alpha has suffered an injury caused by the Distributed Generation Provision or the 2:1 Provision.

Moreover, were the Court to strike down the Distributed Generation Provision or the 2:1 Provision, Alpha's ability to compete in the energy market would be unchanged. Alpha would still be unable to compete for the portion of the energy market reserved for renewable energy.  As such, the Court finds that Alpha has not shown any injury caused by the Distributed Generation Provision or the 2:1 Provision which would be redressed by any relief sought by Plaintiffs in this case.

Because Plaintiffs have not shown that Alpha suffered an injury caused by the Distributed Generation Provision or the 2:1 Provision, or redressable by the relief sought in this case, Alpha does not have standing to challenge these portions of the RES.

> b.   *Rod Lueck's Standing to Challenge this Provision*

Despite the above findings, EELI may still have standing to bring its claims challenging the Distributed Generation Provision and/or the 2:1 Provision if Mr. Lueck has individual standing to pursue these claims.  With regard to Mr. Lueck, Plaintiffs have alleged three injuries: (1) payment of a monthly fee on his electric bill that is attributable to the RES; (2) the need to purchase backup electrical equipment to protect

against potential service interruptions caused by variable power sources; and (3)

aesthetic injury due to bird and bat kills, as well as the loss of vistas, near his family

home in Northeastern Colorado.  (ECF No. 194 at 20.)  The Court will address each of

these alleged injuries below.

i.     RESA Fee

Plaintiffs contend that Mr. Lueck is injured by having to pay the Renewable

Energy Standard Adjustment ("RESA"), a fee utilities are allowed to collect pursuant to

Colo. Rev. Stat. § 40-2-124-(1)(g)(1)(B).  (ECF No. 20.)  Notably, there appears to be a

lack of proof regarding whether Mr. Lueck personally pays any RESA fee. (*See* ECF

No. 198 at 14.)  However, even if the Court were to assume that he personally pays this

fee, and that this fee constitutes an injury for purposes of standing, the record is clear

that this injury was not caused by the Distributed Generation Provision or the 2:1

Provision.  Rather, an entirely different subsection of the RES—which Plaintiffs do not

challenge in this litigation—permits Mr. Lueck's utility to levy this fee.  Thus, if Plaintiffs

were to prevail on their claims, Mr. Lueck's utility company could still continue to charge

him this fee.

Because Plaintiffs have not shown that Mr. Lueck's payment of the RESA fee

was caused by the Distributed Generation Provision or the 2:1 Provision, or that he

could avoid payment of the RESA fee if he prevails in this action, the Court finds that

Mr. Lueck's payment of the RESA fee does not give him standing to challenge either

the Distributed Generation Provision or the 2:1 Provision.

ii.     Purchase of Back Up Electrical Equipment

Plaintiffs next contend that Mr. Lueck was injured because he purchased nearly

$100,000 of electrical equipment to ensure that his company's electrical service would not be interrupted.  (ECF No. 194 at 21.)  First, it is questionable whether this purchase constituted an injury to Mr. Lueck personally, rather than his business.  The fact that Mr. Lueck's name appears on the paperwork for the purchase does not mean that he made the purchase on his own behalf rather than in his capacity as president of his company.  At his deposition, Mr. Lueck testified that he was "pretty sure [the electrical backup equipment] was paid out of the company because it was for company property."  (Lueck Dep. (ECF Nos. 188-3 & 194-5) p. 86.)  On this record, the Court finds that Plaintiffs have not shown that Mr. Lueck personally suffered an injury when he purchased the backup electrical equipment.

Moreover, even assuming that this expenditure was an injury personal to him, Mr. Lueck's purchase of the backup electrical equipment was not caused or required by the Distributed Generation Provision or the 2:1 Provision, and also would not be redressed by the relief sought in this case.  Mr. Lueck contends that he needed to purchase the backup electrical equipment because of the unreliability of solar and wind power, which have increased since the RES was enacted.  (Lueck Dep. at 118-19.)  While this injury could arguably have been caused by the Renewables Quota, which Defendants admit has had the effect of increasing the proportion of electricity generated from renewable sources, Plaintiffs have made no attempt to show how either the Distributed Generation Provision or the 2:1 Provision have contributed to the unreliability of Mr. Lueck's electrical service.  Given that Plaintiffs bear the burden of proving standing, this failure  of proof alone is fatal to these claims.

Finally, Plaintiffs have failed to show that, if the Court struck the Distributed

Generation Provision or the 2:1 Provision from the RES, the electrical grid would become more reliable. The Renewables Quota would still require that up to 30% of the electrical power generated by utilities come from renewable sources.  Without the Distributed Generation Provision, the likely result would be more wind and solar power from large-scale installations.  There is no evidence in the record showing that wind and solar power from large-scale installations is more reliable than wind and solar from distributed generation.  If the 2:1 Provision is eliminated, rural cooperative electrical associations and municipally owned utilities would have to increase their generation of energy from renewable sources which, if anything, would increase the unreliability of which Plaintiffs complain.

Accordingly, the Court finds that Plaintiffs have failed to show that Mr. Lueck's purchase of backup electrical equipment gives him standing to challenge the Distributed Generation Provision or the 2:1 Provision.

iii.    Aesthetic Injury

For his final alleged injury, Mr. Lueck asserts that, since the RES was enacted, there has been an increase in bird and bat kills near family property in Northeastern Colorado, and that his vistas have been disturbed by windmills.  (ECF No. 194 at 21.) Having reviewed the record, the Court finds that there is a lack of proof supporting this purported injury.  Mr. Lueck testified at his deposition that he has never personally seen any birds or bats killed by windmills.  (Lueck Dep. at 142.)  He stated that he read articles online about how windmills harmed birds, but could not offer any specific information about kinds of birds, the frequency with which strikes occur, or strikes occurring on or near his property.  (*Id.*)  The only specific information Mr. Lueck had

-16-

about bird or bat strikes near his property was a conversation he had with a local farmer, during which the farmer indicated that he would sometimes find bird carcasses on his property.  (*Id*. at 143.)

The Court finds that this evidence is insufficient to prove an injury to birds or bats in the area near Mr. Lueck's family property.  A farmer talking about a few dead birds is not a sufficient injury to confer standing.  In fact, after describing his conversation with the farmer, Mr. Lueck went on to say that radio towers and roads also kill birds and bats.  (Lueck Dep. at 143.)  In short, there is no evidence specifically linking these bird or bat deaths to the windmills near his family property.

In their Opposition to the Motion, Plaintiffs rely on a 2002 study of the Ponnequin, Colorado wind plant which showed that several dead bats were found over a 3-year period.  (ECF No. 194 at 10.)  As the Ponnequin facility is over 100 miles from Mr. Lueck's family property, this study does not show that bats were injured near his property.  Moreover, the study predates the enactment of the RES by four years, and therefore does not show that any provision in the RES caused the identified bat deaths. In fact, Plaintiffs have failed to link any of the windmills near Mr. Lueck's property to any aspect of the RES, much less the Distributed Generation Provision or the 2:1 Provision. Wind power existed before the RES were enacted, and there is no evidence that the wind power industry would cease to operate if the Court were to strike down any aspect of the RES.

With regard to an injury to the vistas near Mr. Lueck's property, there is similarly a failure of proof of an injury in the record.  Plaintiffs have failed to cite any evidence wherein Mr. Lueck discusses his enjoyment of the vistas from his family property, or

-17-

how the vistas have been harmed by the RES.  Moreover, to the extent Plaintiffs have

attempted to show any causation, they argue only that the "RES quotas" increase the

need for new wind facilities, which is insufficient to link either the Distributed Generation

Provision or the 2:1 Provision to the increase in windmills near Mr. Lueck's property.

(ECF No. 194 at 22.)   As such, any injury to the vistas surrounding Mr. Lueck's family

property does not provide standing to challenge the Distributed Generation Provision or

the 2:1 Provision.

        *Conclusion*

        In sum, Plaintiffs have failed to adduce sufficient evidence to show that either Mr.

Lueck or Alpha would have standing to challenge the Distributed Generation Provision

or the 2:1 Provision.  Because EELI has not shown that any of its members would have

standing to challenge these provisions, EELI lacks associational standing.  *See Hunt v.*

*Wash. State Apple Adver. Comm.*, 432 U.S. 333, 343 (1977) (holding that a member of

an association must have standing in his own right in order for the association to have

standing).  Accordingly, Plaintiffs have failed to show that they have standing to bring

Claims 3, 4, 5, and 6 of the Amended Complaint, and such claims must be dismissed

without prejudice for lack of jurisdiction on the part of this Court to adjudicated these

claims.

**B.     Prudential Standing**

        As the Court has found that Plaintiffs have shown that they have constitutional

standing to bring claims 1 and 2 of the Amended Complaint challenging the

Renewables Quota, the Court must next determine whether they have prudential

standing to assert these claims.  *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 474 (1982) ("Beyond the constitutional requirements [for standing], the federal judiciary has also adhered to a set of prudential principles that bear on the question of standing.").

Prudential standing is a set of "judicially self-imposed limits on the exercise of federal jurisdiction".  *Allen*, 468 U.S. at 751.  First, "even when the plaintiff has alleged injury sufficient to meet the 'case or controversy' requirement, . . . the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties."  *Warth*, 422 U.S. at 499.  Second, "when the asserted harm is a 'generalized grievance' shared in substantially equal measure by all or a large class of citizens, that harm alone normally does not warrant exercise of jurisdiction."  *Id.*  And third, "the interest sought to be protected [must be] arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question."  *See Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153 (1970); *see also Allen*, 468 U.S. at 751 (summarizing all three prudential standing principles).  This third element—whether Plaintiffs' claims lie within the zone of interests of the Commerce Clause—is the only aspect of the prudential standing test challenged here.

The dormant Commerce Clause "confer[s] a right to engage in interstate trade free from restrictive state legislation" because it "was intended to benefit those who . . . are engaged in interstate commerce".  *Dennis v. Higgins*, 498 U.S. 439, 449 (1991).  To determine whether Plaintiffs' challenge of the Renewables Quota falls within the zone of

interests of the dormant Commerce Clause, the Court must look at: (1) whether the Renewables Quota is facially discriminatory against out-of-state economic interests; or (2) whether the Quota is excessively burdensome to interstate commerce.  *See Cibolo Waste, Inc. v. City of San Antonio*, 718 F.3d 469, 475 (5th Cir. 2013).

Plaintiffs do not allege that the Renewables Quota is facially discriminatory against out-of-state economic interests.  Indeed, nothing in the Renewables Quota appears to treat energy generated outside the state of Colorado different than energy produced within the state of Colorado.  The distinction drawn by the Renewables Quota is between renewable and non-renewable energy, and is not focused on in-state versus out-of-state economic interests.

However, the Court finds that Plaintiffs have prudential standing to challenge the Renewables Quota on the basis that it generally burdens interstate commerce.  The "zone of interests" element of prudential standing "is not meant to be especially demanding".  *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 132 S. Ct. 2199, 2210 (2012).  As long as the interest asserted by the Plaintiffs is "arguably within the zone of interests to be protected or regulated by the statute", the Court must find that prudential standing has been satisfied.  *Id*.  "An allegation that the plaintiff is involved in interstate commerce is burdened by the ordinance in question is sufficient to satisfy the zone of interests test with respect to ordinances that assertedly impose an excessive burden on interstate commerce."  *Nat'l Solid Waste Mgmt. Ass'n v. Pine Belt Reg'l Solid Waste Mgmt. Auth.*, 389 F.3d 491, 500 (5th Cir. 2004).

Given this low standard, the Court has little difficulty concluding that Plaintiffs'

challenge of the Renewables Quota falls within the zone of interests protected by the dormant Commerce Clause.  Alpha engages in interstate commerce by selling coal across state lines, and electrical grids are inherently interstate commerce as they run across the entire country.  The Renewables Quota mandates that up to 30% of the energy used by Colorado utilities come from renewable sources.  This restriction has a significant impact on Alpha's ability to market and sell its coal in Colorado, which gives Plaintiffs prudential standing to bring claims 1 and 2.

## IV.  CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1.   Defendants' Early Motion for Summary Judgment on Plaintiffs' Lack of Standing (ECF No. 188) is GRANTED IN PART and DENIED IN PART;

2.   Plaintiffs' claims challenging the Distributed Generation Provision (Claims 3 & 4) and the 2:1 Provision (Claims 5 & 6) are DISMISSED WITHOUT PREJUDICE based on the Court's finding that Plaintiffs lack standing to assert these claims;

3.   This case shall proceed only on Plaintiffs' claims challenging the Renewables Quota (Claims 1 & 2).

Dated this 1st day of May, 2014.

BY THE COURT:

William J. Martinez
United States District Judge