**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 11-cv-00859-WJM-BNB

ENERGY AND ENVIRONMENT LEGAL INSTITUTE, and
ROD LUECK,

      Plaintiffs,

v.

JOSHUA EPEL,
JAMES TARPEY, and
PAMELA PATTON, in their official capacities as Commissioners of the Colorado Public
Utilities Commission,

      Defendants,

and

ENVIRONMENT COLORADO,
CONSERVATION COLORADO EDUCATION FUND,
SIERRA CLUB,
THE WILDERNESS SOCIETY,
SOLAR ENERGY INDUSTRIES ASSOCIATION, and
INTERWEST ENERGY ALLIANCE,

      Intervenor-Defendants,

---

**ORDER DENYING PLAINTIFFS' EARLY MOTION FOR SUMMARY JUDGMENT AND
GRANTING DEFENDANTS & INTERVENOR-DEFENDANTS' EARLY MOTION FOR
SUMMARY JUDGMENT**

---

      This action challenges the constitutionality of Colorado's Renewable Energy

Standard statute, Colo. Rev. Stat. § 40-2-124.  In this case's current posture, Plaintiffs

seek a declaration that the provision requiring that Colorado utility companies obtain an

increasing proportion of their electricity from renewable sources violates the Commerce

Clause of the United States Constitution.  (Sec. Am. Compl. (ECF No. 163) pp. 40-45.)

Before the Court are the following motions: (1) Plaintiffs' Early Motion for Partial Summary Judgment ("Plaintiffs' Motion") (ECF No. 180); and (2) Defendants and Intervenor-Defendants' Early Motion for Summary Judgment on Claims 1 and 2 ("Defendants' Motion") (ECF No. 186).  For the reasons set forth below, Plaintiffs' Motion is denied and Defendants' Motion is granted.

## I.  LEGAL STANDARD

Summary judgment is appropriate only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Henderson v. Inter-Chem Coal Co., Inc.*, 41 F.3d 567, 569 (10th Cir. 1994).  Whether there is a genuine dispute as to a material fact depends upon whether the evidence presents a sufficient disagreement to require submission to a jury or conversely, is so one-sided that one party must prevail as a matter of law.  *Anderson v. Liberty Lobby*, 477 U.S. 242, 248-49 (1986); *Stone v. Autoliv ASP, Inc.*, 210 F.3d 1132 (10th Cir. 2000); *Carey v. U.S. Postal Serv.*, 812 F.2d 621, 623 (10th Cir. 1987).

A fact is "material" if it pertains to an element of a claim or defense; a factual dispute is "genuine" if the evidence is so contradictory that if the matter went to trial, a reasonable party could return a verdict for either party.  *Anderson*, 477 U.S. at 248. The Court must resolve factual ambiguities against the moving party, thus favoring the right to a trial.  *Houston v. Nat'l Gen. Ins. Co.*, 817 F.2d 83, 85 (10th Cir. 1987).

2

## II.  FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Plaintiff Energy and Environment Legal Institute[1] ("EELI") is a non-profit organization which describes itself as being dedicated to the advancement of rational, free-market solutions to land, energy, and environmental challenges in the United States.  (Am. Compl. ¶ 3.)  EELI also promotes coal energy, and believes that the impact human activities have had on the rise in global temperatures is an open question.  (ECF No. 188 ¶ 3; ECF No. 194-1.)  Plaintiff Rod Lueck is a member of EELI who resides in Colorado.  (*Id*. ¶ 4.)  Defendants Joshua Epel, James Tarpey, and Pamela Patton are members of the Colorado Public Utilities Commission.  (*Id*. ¶¶ 6-8.)  The Intervenor-Defendants are various non-profit organizations devoted to preserving the environment or promoting renewable energy resources and industries.  (*See*, ECF Nos. 21 & 73-75.)  For purposes of this Order, the Court's reference to "Defendants" includes the named Defendants and the Intervenor-Defendants.

In 2004, Colorado voters passed Amendment 37, which was intended to promote the development and utilization of renewable energy resources.  (*Id*. ¶ 60.)  Amendment 37 was codified in 2005 as the Renewable Energy Standard statute (the "RES") at Colo. Rev. Stat. § 40-2-124.  Although Plaintiffs originally challenged other aspects of the RES, at this point in the case, the only remaining claims assert that Colo. Rev. Stat. §§ 40-2-124(1)(c)(I),(V),(V.5) and 40-2-124(3),(4), and their implementing regulations codified at 4 Colo. Code Regs. §§ 723-3 *et seq*. (together, the "Renewables Quota"), violate the

---

[1]  The Energy and Environment Legal Institute was formerly known as the American Tradition Institute.  (ECF No. 200.)  Plaintiffs represent that this was only a name change and does not impact the purpose or activities of the institute.

Commerce Clause of the United States Constitution.  (*Id*. ¶¶ 137-51.)

The Renewables Quota requires each retail utility to generate, or cause to be generated, renewable energy resources in specified minimum amounts.  (*Id*. ¶¶ 137-141.)  As originally formulated, the Renewables Quota required certain Colorado electric utilities to provide 10% of their retail electricity sales from renewable sources by 2015.  (ECF No. 186-1 at 23.)  Since the RES was adopted, the Colorado Legislature has amended the statute three times to increase the Renewables Quota and to add different kinds of electricity generation entities.

As it currently stands, the Renewables Quota includes three distinct requirements depending on the type and size of electric utility.  By 2020, investor-owned utilities such as Xcel must obtain 30% of their retail electricity sales from renewable sources.  Colo. Rev. Stat. § 40-2-124(1)(C)(I)(E).  Cooperative electric associations serving 100,000 or more utility meters must obtain sufficient renewable energy to supply 20% of their electricity by 2020.  *Id*. § 40-2-124(1)(c)(V.5).  Cooperative associations serving fewer than 100,000 utility meters, as well as large municipal utilities, must obtain 10% of their retail sales from renewable sources by 2020.  *Id*. § 40-2-124(1)(c)(V)(D).

The RES allows utilities to meet their Renewables Quota by either generating or buying renewable power directly, or by purchasing renewable energy credits.  Colo. Rev. Stat. § 40-2-124(1)(d).  The RES defines the types of energy that can be credited towards a utility's Renewables Quota, and includes certain types of both recycled energy and energy generated from renewable sources.  *Id*. § 40-2-104(1)(a).  Recycled energy is energy captured from the heat from exhaust stacks or pipes that would otherwise be

lost, and which does not combust additional fossil fuel.  *Id*. § 40-2-104(1)(a)(VI).  The

RES's definition of renewable energy resources includes solar, wind, geothermal,

biomass, and hydroelectricity with certain restrictions.  *Id*. § 40-2-104(1)(a)(VII).

The RES and its implementing regulations also create a system of tradable

renewable energy credits that may be used by a utility to fulfil its Renewables Quota.

Colo. Rev. Stat. § 40-1-104(1)(d).  For a Colorado utility to use renewable energy (or

renewable energy credits) towards its Renewables Quota, it must seek approval from

Colorado's Public Utility Commission.  4 Colo. Code Regs. § 723-3-3656.  Certain

utilities must also submit to the Public Utilities Commission a plan detailing how they

intend to comply with the Renewables Quota, including estimates of the amount of

renewable energy that will be generated by various sources.  *Id*. § 723-3-3657.  An

approved plan carries a rebuttable presumption that the utility is acting with prudence.

*Id*. § 723-3-3657(c).

In April 2011, Plaintiffs filed this lawsuit challenging six aspects of the then-

existing statutory scheme.  (ECF No. 1.)  The case was stayed pending resolution of

jurisdictional and immunity issues.  (ECF No. 46.)  Defendants moved to dismiss this

action, arguing that Plaintiffs lacked standing to pursue their claims.  (ECF Nos. 28 &

37.)  The Court granted in part and denied in part those motions, dismissing all claims

brought against the State of Colorado, Defendants John Hickenlooper and Barbara

Kelley, and all monetary claims against the Defendants in their official capacities.  (ECF

No. 64.)  The Court found that Plaintiffs had sufficiently alleged facts to show that they

had standing to survive the Motion to Dismiss as to the claims for injunctive and

declaratory relief brought against the members of the Public Utilities Commission in

their official capacities, as well as Plaintiffs' claim under 42 U.S.C. § 1983 for monetary damages brought against these Defendants in their individual capacities.  (*Id.*)  Plaintiffs then voluntarily dismissed their claim for damages under § 1983.  (ECF No. 70.)

After these rulings the stay was lifted and the case proceeded to discovery. (ECF Nos. 65 & 149.)  In 2013, the Colorado Legislature passed significant revisions to the RES that impacted Plaintiffs' claims.  *See* A Bill for An Act Concerning Measures to Increase Colorado's Renewable Energy Standard so as to Encourage the Deployment of Methane Capture Technologies, S.B. 13-252 (69th Gen. Assembly 2013).   In response to these changes, Plaintiffs filed a Second Amended Complaint which brings six claims challenging three aspects of the RES.  (ECF No. 163.)  The Second Amended Complaint is the operative pleading for this case.

Near the close of discovery, Plaintiffs filed their Early Motion for Summary Judgment seeking judgment in their favor on all claims.  (ECF No. 180.)  Shortly thereafter, Defendants filed their Early Motion for Partial Summary Judgment, which seeks judgment in their favor on claims 1 and 2, which relate to the Renewables Quota. (ECF No. 186).  These motions are fully briefed and are presently before the Court.

At the same time, Defendants also filed a Motion for Summary Judgment renewing their argument that Plaintiffs lacked standing to pursue their claims.  (ECF No. 188.)  The Court found that Plaintiffs lacked standing to pursue claims 3-6, but that they had established standing to pursue claims 1 and 2.  (ECF No. 219.)  The dismissal of claims 3-6 moots significant portions of the Plaintiffs' Motion for Summary Judgment, but the Court will address all arguments relevant to claims 1 and 2.

## III.  ANALYSIS

"The Commerce Clause provides that 'Congress shall have Power . . . [t]o regulate Commerce with foreign Nations, and among the several States.'"  *United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 337 (2007) (quoting U.S. Const. art. I, § 8, cl. 3).  In addition to that express authority, courts have also interpreted the Commerce Clause to restrain state authority implicitly, which is referred to as the dormant Commerce Clause.  *See id*.  The "central rationale" of the dormant Commerce Clause "is to prohibit state or municipal laws whose object is local economic protectionism, laws that would excite those jealousies and retaliatory measures the Constitution was designed to prevent."  *C & A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 390 (1994).

In this circuit, a state statute may violate the dormant Commerce Clause in three ways.  First, a statute that clearly discriminates against interstate commerce in favor of intrastate commerce is virtually invalid *per se* and can survive only if the discrimination is demonstrably justified by a valid factor unrelated to economic protectionism.  *KT&G Corp. v. Attorney Gen. of Okla.*, 535 F.3d 1114, 1143 (10th Cir. 2008).  Second, a statute will be invalid *per se* if it has the practical effect of controlling commerce occurring entirely outside the boundaries of the state in question.  *Id.*  Finally, if the statute does not discriminate against interstate commerce, it will nevertheless be invalidated if it imposes a burden on interstate commerce which is not commensurate with the local benefits secured.  *See Pike v. Bruce Church Inc.*, 397 U.S. 137, 142 (1970).

**A.     Scope of the Motions**

In Defendants' Motion, they argue that Plaintiffs cannot show that the Renewables Quota violates the dormant Commerce Clause under any of the above theories.  (ECF No. 186 at 18-19.)  Despite the fact that Defendants' Motion plainly moves for summary judgment as to each theory of a dormant Commerce Clause violation, in response to Defendants' Motion, Plaintiffs argue that the only issue properly before the Court is whether the Renewables Quota improperly regulates wholly extra-territorial commerce.  (ECF No. 193 at 11.)  Plaintiffs appear to have formed this belief based on the limited scope of their own early Motion for Summary Judgment, which argues only that Plaintiffs are entitled to an affirmative grant of summary judgment on claims 1 and 2 under the second theory of extra-territorial control.  (*See id*. at 12-13 (stating that whether the Renewables Quota is discriminatory is not before the Court because Plaintiffs did not raise the issue in their Motion).)  Plaintiffs' Motion does not address the argument that the Renewables Quota is discriminatory or that it fails the *Pike* test.  (*Id*.)

Despite Plaintiffs' contention to the contrary, the scope of the issues before the Court is not limited by the arguments raised by Plaintiffs in their affirmative summary judgment motion.  While the Court must address any arguments raised therein, it must also address all arguments raised by Defendants in their separate summary judgment motion.  *See* Fed. R. Civ. P. 56(a) ("A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought.").  Plaintiffs' failure to apprehend the correct scope of the

issues presented by Defendants' Motion is legally of no moment; as it must under Rule 56, the Court will consider in turn each of the contentions Defendants advance for entry of judgment in their favor as a matter of law.

Defendants' opening brief plainly moves for summary judgment as to each of the theories for a dormant Commerce Clause violation.  (ECF No. 186 at 19-31.)  It sets forth the test governing each theory, and explicitly analyzes how the Renewables Quota does not violate any of these tests.  (*Id*.)  The burden then shifts to Plaintiffs to show a genuine dispute of fact as to whether Defendants were entitled to summary judgment under each theory.  *See Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991).  To discharge this burden, Plaintiffs are required "go beyond the pleadings and by their own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial."  *Celotex*, 477 U.S. at 324 (internal quotations omitted).  The Court will analyze each of the arguments raised by the parties with this standard in mind.

However, before reaching the merits of the parties' arguments, the Court must address Plaintiffs' contention that the Court's consideration of the *Pike* balancing test—the third way to show a dormant Commerce Clause violation—is premature. (ECF No. 193 at 12.)  Plaintiffs contend that disposition of the *Pike* balancing test is premature, both because Plaintiffs did not move for summary judgment under this theory, and because discovery is ongoing.  (*Id*.)  As noted above, the scope of Plaintiffs' Motion does not operate to limit in number or substance the issues that could be raised by Defendants in their separate Motion.

Moreover, the fact that discovery was ongoing at the time Plaintiffs' opposition to Defendants' Motion was filed also does not make disposition of the *Pike* balancing test at this juncture of the proceedings premature.  Though Plaintiffs cite Federal Rule of Civil Procedure 56(d) in their Response, they did not file a motion under this rule.  Both this Court's local rules and the undersigned's Revised Practice Standards require that all requests for the Court to take any action or grant any relief be contained in a *separate*, written motion.  *See* D.C.COLO.LCivR ; WJM Revised Practice Standards III.B (effective Dec. 1, 2013).  Plaintiffs' citation to Rule 56(d) in their opposition brief is insufficient to function as a request that the Court defer ruling on any aspect of Defendants' Motion.  *See* WJM Revised Practice Standards III.B ("A request of this nature contained within a brief, notice, status report or other written filing does not fulfill this Practice Standard.").

Additionally, more than six months have passed since Plaintiffs' brief was filed. In that time, discovery has closed.  (*See* ECF No. 208 (setting a January 24, 2014 discovery deadline).)  However, despite the fact that Plaintiffs have repeatedly called additional legal authority to the Court's attention (*see* ECF Nos. 203 & 217), they have not sought leave to supplement their response to Defendants' Motion with any additional evidence obtained in discovery.  As such, the Court sees no reason to defer ruling on any aspect of Defendants' Motion.

**B.    Discrimination Against Out-of-State Interests**

"State laws discriminating against interstate commerce on their face are 'virtually *per se* invalid.'"  *Fulton Corp. v. Faulkner*, 516 U.S. 325, 331 (1996) (quoting *Or. Waste*

*Sys., Inc. v. Dep't of Envl. Quality of Or.*, 511 U.S. 93, 99 (1994)).  "In this context, 'discrimination' simply means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *United Haulers*, 550 U.S. at 338 (quotation omitted).

Defendants move for summary judgment under this theory, arguing that the Renewables Quota does not discriminate against interstate commerce on its face, or in its purpose or effect.  (ECF No. 186 at 19.)  In response to this argument, Plaintiffs have made no attempt to identify specific facts showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 324.  In fact, Plaintiffs have candidly admitted that "[d]iscrimination under Claims 1 & 2 is not before the Court" and "[w]hether those economic purposes have a discriminatory design is not at issue for Claims 1 & 2." (ECF No. 193 at 11, 13.)

Thus, the Court finds that Plaintiffs have not met their burden of showing that any dispute of material fact exists as to whether the Renewables Quota discriminates against out-of-state interests.  It therefore necessarily follows that the Court must grant Defendants' Motion for Summary Judgment as to this theory of establishing a dormant Commerce Clause violation.

## C.    Practical Effect of Extraterritorial Control

Both parties move for summary judgment under the theory that the RES violates the Commerce Clause by attempting to control wholly extraterritorial commerce.  To determine whether a regulatory scheme violates the Commerce Clause under this theory, the Court must look beyond the plain language of the statute and evaluate its

practical effect to discern whether it controls extraterritorial commerce.  *KT&G Corp. v. Att'y Gen. of Okla.*, 535 F.3d 1114, 1143 (10th Cir. 2008).  The legislative intent behind a statutory scheme is irrelevant.  *Healy v. Beer Inst., Inc.*, 491 U.S. 324, 336 (1989).

Courts have found that statutes which tie pricing decisions in one state to the prices charged for the same good in another state are invalid.  *See, e.g., Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 575-76 (1986) (finding statute that required distillers to post prices at the beginning of each month and did not permit sale for lower prices in other states controlled extraterritorial commerce because it "forc[ed] a merchant to seek regulatory approval in one State before undertaking a transaction in another"); *Healy*, 491 U.S. at 328 (statute that required beer distributors to affirm that the prices they charged in Connecticut were as low as any charged in neighboring states violated the Commerce Clause because it "create[d] just the kind of competing and interlocking local economic regulation that the Commerce Clause was meant to preclude.").

Statutes that attempt to impose one state's policy decisions on other states are also invalid.  For example, in *National Solid Wastes Management Association v. Meyer*, 63 F.3d 652, 653-54 (7th Cir. 1995), the court struck down a Wisconsin statute that conditioned imports of waste on the exporting jurisdiction's adoption of Wisconsin's recycling standards.  Finally, statutes that regulate commercial transactions between two out-of-state entities also violate the Commerce Clause.  *See Edgar v. MITE Corp.*, 457 U.S. 624, 642 (1982) (striking down an Illinois statute that required companies with certain minimal ties to Illinois to submit all tender offers for approval by Illinois officials,

even when the offers were made by a foreign company to shareholders entirely out-of-state); *Pharm. Res. & Mfrs. of Am. v. Dist. of Columbia*, 406 F. Supp. 2d 56 (D.D.C. 2005) (D.C. statute that made it unlawful for any drug manufacturer or licensee to "sell or supply for sale a patented prescription drug that results in the prescription drug being sold in the District for an excessive price" was unlawful because it could hold a company liable in D.C. for a transaction that occurred entirely out-of-state).  Despite the various ways this doctrine has manifested itself, "[i]n the modern era, the Supreme Court has rarely held that statutes violate the extraterritorality doctrine."  *Rocky Mountain Farmers Union v. Corey*, 730 F.3d 1070, 1101 (9th Cir. 2013).

Plaintiffs argue that the Renewables Quota places a restriction on how out-of-state goods are manufactured in that it requires out-of-state electricity to be generated according to Colorado's terms.  (ECF No. 193 at 16.)  Plaintiffs contend that the Renewables Quota is a "mandate" which requires energy produced wholly out-of-state to comply with Colorado-approved methods for renewable energy.  (*Id.*)  Plaintiffs argue that this mandate operates to project policy decisions made by voters in Colorado onto other states, such as Wyoming.  (*Id.*)

The Court disagrees.  First, the Renewables Quota does not impact transactions between out-of-state business entities.  If a Wyoming coal company generates electricity and sells it to a South Dakota business, the Colorado Renewables Quota does not impact that transaction in any way.  The Renewables Quota only regulates Colorado energy generators and the companies that do business with *Colorado* energy generators.  As Plaintiffs acknowledge, a state can regulate electricity generation

occurring within its borders.  (ECF No. 193 at 17.)  Because the Renewables Quota does not affect commerce unless and until an out-of-state electricity generator freely chooses to do business with a Colorado utility, it does not impermissibly control wholly out-of-state commerce.  *See Quik Payday, Inc. v. Stork*, 549 F.3d 1302, 1308-09 (10th Cir. 2008) (statute that regulated payday loans did not affect wholly extraterritorial commerce because it only applied when some aspect of the transaction, such as where the funds were deposited, occurred in Kansas); *Rocky Mountain Farmers*, 730 F.3d at 1103 (holding that, under the dormant Commerce Clause, there is a distinction between statutes "that regulate out-of-state parties directly" and those that "regulate contractual relationships in which at least one party is located in the regulating state").

Moreover, the Renewables Quota does not mandate that an out-of-state energy generator do business in any particular manner.  Colorado energy companies are free to buy and sell electricity from any in-state or out-of-state generator.  The RES does not limit these transactions, set minimum standards for out-of-state generators that wish to do business in Colorado, or attempt to control pricing of the electricity.  Rather, the RES comes into play only with regard to whether energy purchased by a Colorado utility from an out-of-state electricity generator will count towards the Colorado utility's Renewables Quota.  As such, the RES does not impose conditions on the importation of electricity into Colorado.  *See Rocky Mountain Farmers*, 730 F.3d at 1102-03 (California fuel standards did not impose conditions on the importation of ethanol where they did not attempt to control the ethanol produced, sold, or used outside of California, did not require other jurisdictions to adopt certain standards, and did not attempt to affect pricing of ethanol).

The Court agrees with Plaintiffs that the RES may influence the way out-of-state electricity generators do business because the Renewables Quota provides Colorado utilities an incentive to purchase electricity that can be credited towards their Renewables Quota.  However, the fact that this incentive structure may negatively impact the profits of out-of-state generators whose electricity cannot be used to fulfil the Quota does not make the Renewables Quota invalid.  The dormant Commerce Clause neither protects the profits of any particular business, nor the right to do business in any particular manner.  *See Pharm. Res. & Mfrs. of Am. v. Concannon*, 249 F.3d 66, 82 (1st Cir. 2001) ("Simply because the manufacturers' profits might be negatively affected . . . , does not mean that the Maine Act is regulating those profits."); *Exxon Corp. v. Maryland*, 437 U.S. 117, 127 (1978) ("We cannot . . . accept appellants' underlying notion that the Commerce Clause protects the particular structure or methods of operation in a retail market.").  Thus, the fact that the RES may economically harm companies—both in-state and out-of-state—that produce non-renewable energy does not mean that it violates the dormant Commerce Clause.

Moreover, the fact that the RES may provide an incentive for out-of-state companies to conduct their business in a manner that complies with Colorado's renewable energy standards also does not make the statute improper.  *See Rocky Mountain Farmers*, 730 F.3d at 1103 ("States may not mandate compliance with their preferred policies in wholly out-of-state transactions, but they are free to regulate commerce and contracts within their boundaries with the goal of influencing the out-of-state choices of market participants."); *see also Pharm. Res. & Mfrs. of Am. v. Walsh*,

15

538 U.S. 664, 679 (2003) (holding that Maine was free to create an incentive for drug companies to negotiate favorable rates with its Medicaid program so long as it did not regulate the price of any out-of-state transaction or tie the price of a product purchased in-state to out-of-state products).   The dormant Commerce Clause does not prevent states from creating incentive structures to attract certain kinds of business.  *See Directv, Inc. v. Treesh*, 487 F.3d 471, 481 (6th Cir. 2007) (holding that Kentucky's taxing scheme designed to attract certain kinds of business did not violate the dormant Commerce Clause); *Rocky Mountain Farmers*, 730 F.3d 1070, 1101 (9th Cir. 2013) ("Firms in any location may elect to respond to the incentives provided by the Fuel Standard if they wish to gain market share in California, but no firm must meet a particular carbon intensity standard, and no jurisdiction need adopt a particular regulatory standard for its producers to gain access to California.").

Plaintiffs also argue that the Renewables Quota violates the dormant Commerce Clause because it is inconsistent with other state statutes that promote renewable energy.  (ECF No. 180 at 23.)  For example, Plaintiffs point out that Utah's definition of a renewable energy fuel source includes a facility that derives its energy from methane gas from an abandoned coal mine.  (*Id.*)   Other states that have a system similar to Colorado's RES permit credit for ocean thermal and wave generation electricity sources.  (*Id.*)

This contention by Plaintiffs fails, however, because the Commerce Clause has not been applied so broadly as to strike down any state regulation that differs from other states.  The only cases in which the Supreme Court has held that the federal need for uniformity outweighs the state's ability to devise its own regulations involve

areas like foreign trade and interstate transportation. *See Japan Line, Ltd. v. Cnty. of L.A.*, 441 U.S. 434, 448 (1979); *Bibb v. Navajo Freight Lines, Inc.*, 359 U.S. 520, 526-27 (1959). Plaintiffs have failed to demonstrate that there exists such a compelling need for uniformity in the market for renewable energy credits that having a system of different or even inconsistent state regulations is unworkable. Moreover, the Renewables Quota extends only to Colorado utilities. As such, any conflict between Colorado's definition of renewable energy and that adopted by a neighboring state would have minimal impact on interstate commerce. *See Rocky Mountain Farmers*, 730 F.3d at 1105 ("So long as California regulates only fuel consumed in California, the Fuel Standard does not present the risk of conflict with similar statutes.").

Finally, Plaintiffs contend that the requirement that out-of-state companies seek approval from the Colorado Public Utility Commission shows that Colorado is forcing its policy decisions onto other states. However, the RES does not at all impose any obligations on an out-of-state company; only Colorado utilities are required to seek approval from the Commission before electricity they purchase can count towards their Renewables Quota. *See* 4 Colo. Code Regs. § 723-3-3656. Because the RES only requires that electricity generated by out-of-state companies be approved by the Colorado commission when a Colorado utility wants to use that electricity factor to fulfill its Renewables Quota, this requirement neither regulates wholly extraterritorial commerce nor imposes Colorado's policy decisions on other states.

In sum, out-of-state companies are free to generate electricity using whatever method they choose, can sell that electricity to whomever they choose—inside or outside of Colorado—and can do so at whatever price they choose. The RES does not

17

control any aspect of a transaction between two out-of-state entities; it governs only whether electricity purchased by a Colorado utility counts towards that utility's Renewables Quota.  As such, the Court finds that Plaintiffs have failed to show that there is any material fact in dispute as to whether the RES improperly regulates wholly out-of-state commerce.

**D.      *Pike* Test**

Under *Pike v. Bruce Church, Inc.*, a state statute that does not directly regulate or discriminate against interstate commerce may nonetheless still be invalid if the "burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits."  397 U.S. 137, 142 (1970).  "[T]he extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities."  *Id*. The party challenging the statute bears the burden of establishing a *Pike* violation.  *See Dorrance v. McCarthy*, 957 F.2d 761, 763 (10th Cir. 1992).

The Tenth Circuit has held that, when considering the *Pike* balancing test, the Court must consider four factors: (1) the burden on interstate commerce; (2) the nature of the putative benefits conferred by the statute; (3) whether the burden is "clearly excessive in relation to" the local interests; and (4) whether the local interests can be promoted as well with a lesser impact on interstate commerce.  *Blue Circle Cement, Inc. v. Bd. of Cty. Comm'rs*, 27 F.3d 1499, 1512 (10th Cir. 1994).

With regard to the burden on interstate commerce, Plaintiffs argue that the RES burdens interstate commerce due to a lack of uniformity in state laws.  (ECF No. 193 at

18

23.)  Plaintiffs point out that thirty states and the District of Columbia have mandatory renewable energy standards with various renewables requirements.  (*Id*. at 23, n.19.) The Supreme Court has held that a lack of uniformity amongst state laws can be a significant burden to interstate commerce, but those cases involve interstate travel such as railroads and trucking.  *See Raymond Motor Transp., Inc. v. Rice*, 434 U.S. 429, 445 (1978) (striking down statute that limited length of tractor-trailers); *Bibb*, 359 U.S. at 526-27.  The Renewables Quota does not make it more difficult for electricity to flow between states that are connected via the same grid.  As such, these cases are readily distinguishable.  Plaintiffs have failed to explain how the various renewables requirements imposed by the states has limited interstate commerce in the electricity market.

Plaintiffs also contend that the RES burdens interstate commerce by impacting commerce beyond the borders of the state, specifically with regard to the reduction in the market for thermal coal and hydrocarbon electricity generation.  (ECF No. 193 at 23.)  While Plaintiffs have presented evidence showing that the Renewables Quota has caused an increased demand for renewable energy in Colorado, which correlates to a decrease in the market share for coal and hydro-carbon, Plaintiffs have failed to show that this shift in the market burdens interstate commerce.  The critical inquiry is whether market shift caused by the Renewables Quota places a greater burden on interstate commerce than is placed on intrastate commerce.  *See V-1 Oil Co. v. Utah Dep't of Pub. Safety*, 131 F.3d 1415, 1425 (10th Cir. 1997) ("The incidental burdens of the *Pike* inquiry are the burdens on interstate commerce that exceed the burdens on intrastate commerce.").  There is no evidence in the record showing that the Renewables Quota

19

causes greater harm to out-of-state coal and hydrocarbon electricity generators than is caused to in-state coal and hydrocarbon electricity generators.  In fact, the record shows that demand for out-of-state coal has increased since the RES was enacted. (ECF No. 186-1 ¶ 23.)  As such, Plaintiffs have failed to show that the market shift away from coal and hydrocarbon electricity generation substantially burdens interstate commerce for purposes of the *Pike* test.

Finally, Plaintiffs contend that the Renewables Quota has burdened interstate commerce because it has reduced the size of the market, which alone is sufficient to meet the *Pike* burden.  (ECF No. 193 at 23-24.)  Though Plaintiffs cite *Exxon Corp.*, in support of their position, that case's holding in fact supports the conclusion that the Renewables Quota does not burden interstate commerce.  In *Exxon*, the Supreme Court held that Maryland's statute barring all producers and refiners of petroleum products from operating any retail outlet within the state did not burden interstate commerce.  437 U.S. at 127.  Though the statute would cause some petroleum refiners to choose not to do business with Maryland, other refiners would step in to fill that spot in the market.  *Id*.  The Court held that "interstate commerce is not subjected to an impermissible burden simply because an otherwise valid regulation causes some business to shift from one interstate supplier to another."  *Id*.

Like in *Exxon*, the Renewables Quota has caused a shift from electricity generated from non-renewable sources to electricity generated by renewable sources. However, this shift from one type of supplier to another has not resulted in a decrease in interstate electricity transmission between Colorado and elsewhere.  In fact, the

record shows that, since the RES was enacted, Colorado's demand for all kinds of electricity—both renewable and non-renewable—has increased.  (ECF No. 177-5 at 28-29.)  Prior to 2007, Colorado was a net exporter of electricity.  (*Id*. at 65.)  By 2010, Colorado's electricity sales exceeded in-state production by 2,000 gigawatt-hours.  (*Id*.)  Plaintiffs have shown only that there has been a shift in the source of electricity generation since the RES was enacted, not that there has been any reduction in the size of the Colorado electricity market or in the amount of electricity imported by Colorado.  Thus, Plaintiffs have not shown that the RES has caused an overall decrease in Colorado's market for electricity—either for electricity produced in-state or out-of-state.

In sum, the Court finds that Plaintiffs have failed to show a genuine dispute of material fact as to whether the Renewables Quota or the RES in general burdens interstate commerce for purposes of the *Pike* test.  This alone is a sufficient basis to grant summary judgment on this claim.  *See Kleinsmith*, 571 F.3d at 1043.  However, even if the Court were to presume that Plaintiffs had met their burden with respect to this aspect of the analysis, summary judgment in favor of Defendants would still be appropriate because Plaintiffs have utterly failed to address any of the three other aspects of the *Pike* test.

The Tenth Circuit has held:

> Any balancing approach, of which *Pik*e is an example,
> requires evidence.  It is impossible to tell whether a burden
> on interstate commerce is clearly excessive in relation to the
> putative local benefits without understanding the magnitude
> of both burdens and benefits.  Exact figures are not
> essential (no more than estimates may be possible) and the

> evidence need not be in the record if it is subject to judicial notice, but it takes more than lawyers' talk to condemn a statute under *Pike*.

*Kleinsmith v. Shurtleff*, 571 F.3d 1033, 1043-44 (10th Cir. 2009) (quoting *Baude v. Heath*, 538 F.3d 608, 612 (7th Cir. 2008)).  Plaintiffs make no attempt to address the putative benefits conferred by the Renewables Quota, nor have they made any showing in regards to whether the burden on interstate commerce is "clearly excessive in relation to" these benefits.  Plaintiffs also fail to offer any alternative schemes that could promote the same interests with a lesser impact on interstate commerce.

Fifty-four percent of Colorado voters voted to approve renewable energy standards for the state in 2004.  (ECF No. 186-2.)  The Supreme Court has frequently admonished that courts should not "second-guess the empirical judgments of lawmakers concerning the utility of legislation."  *CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69, 92 (1987); *Ferguson v. Skrupa*, 372 U.S. 726, 729 (1963) ("[I]t is up to legislatures, not courts, to decide on the wisdom and utility of legislation.").  As Plaintiffs have failed to show that the RES burdens interstate commerce at all, much less that any such burden is clearly excessive in relation to the benefits conferred on the state by the RES, the Court finds that summary judgment in also appropriate with regard to Plaintiffs' claim under the *Pike* test.

## IV.  CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1.      Plaintiffs'  Early Motion for Partial Summary Judgment (ECF No. 180) is
        DENIED;

22

2.     Defendants and Intervenor-Defendants' Early Motion for Summary Judgment on

      Claims 1 and 2 (ECF No. 186) is GRANTED; and

3.     The Clerk shall enter judgment in favor of Defendants on all claims.  Defendants

      shall have their costs.

      Dated this 9th day of May, 2014.

                                  BY THE COURT:

                                    William J. Martinez
                                  United States District Judge